960 P.2d 145

**Russell D. WONG, Plaintiff–Appellee and Cross–Appellant,**

v.

**Laura A. WONG, Defendant–Appellant and Cross–Appellee.**

No. 19721.

Intermediate Court of Appeals of Hawai'i.

May 22, 1998.

Certiorari Denied July 1, 1998.

Paul A. Tomar, Coates & Frey, on the briefs, Honolulu, for defendant-appellant/cross-appellee.

Chunmay Chang, on the briefs, Honolulu, for plaintiff-appellee/cross-appellant.

Before BURNS, C.J., and WATANABE and ACOBA, JJ.

BURNS, Chief Judge.

Defendant–Appellant/Cross–Appellee Laura A. Wong (Laura) appeals the family court's (a) February 16, 1996 Divorce Decree

(Divorce Decree); (b) June 21, 1996 Findings of Fact and Conclusions of Law (FsOF and CsOL); and (c) March 25, 1996 Order Granting Rule 68 Motion. Plaintiff–Appellee/Cross–Appellant Russell D. Wong (Russell) cross-appeals the Divorce Decree and the FsOF and CsOL.

We affirm the Divorce Decree and the FsOF and CsOL. We conclude that the March 25, 1996 Order Granting Rule 68 Motion is void because the family court lacked jurisdiction to enter it.

In this opinion, we discuss: (a) the rules applicable to the question of whether one marital partner gifted his or her Category 1 and/or Category 3 property to the other marital partner; (b) the specifics of the rule that places the risk of loss of certain Category 1 and/or Category 3 property owned by only one of the marital partners solely on the owner; (c) the rules applicable to a marital partner's request for spousal support/alimony; and (d) the rule that, while a case is on appeal, the lower court lacks jurisdiction to decide any questions pertaining to attorney fees arising out of or relating to the matter on appeal.

## BACKGROUND

The FsOF and CsOL state in relevant part as follows:

### FINDINGS OF FACT

1. Plaintiff RUSSELL DAVID WONG [hereinafter "Russell"] was born on October 25, 1956....

2. Defendant LAURA ANN WONG [hereinafter "Laura"] was born on October 24, 1953....

3. The parties were married on September 13, 1986, in Honolulu, Hawaii [Hawai'i]....

4. The parties physically separated on May 20, 1993. [Laura] voluntarily vacated from the marital residence located at 3865 Mariposa Drive, Honolulu, Hawaii [Hawai'i]. [Russell] continues to reside in said residence.

5. The parties have no children born of the marriage.

6. On the date of the parties' marriage, [Russell] had various assets with a net market value of $23,091.... [Laura] had student loans of –$15,663.

7. At the time of the marriage, [Russell] was a medical intern and [Laura] was starting to work as a nurse anesthetist. During the first year of marriage, [Laura] completed her master's degree in anesthesiology. In 1991, [Russell] completed his residency and fellowship and started his own medical practice.

\* \* \*

9. From their marriage in 1986 through 1992, [Russell's] parents gifted to each party $20,000 every year.... After [Russell's] mother passed on in 1992, [Russell's] father continued to gift $10,000 to each party during 1993 and 1994. These gifts were used for the parties' joint expenses.

10. In 1988, the parties purchased ... 61–274C Kamehameha Highway, Haleiwa, Hawaii [Hawai'i].... The parties kept the property as a rental....

11. In 1989, the parties purchased the property located at 573 Paopua Loop, Kailua, Hawaii [Hawai'i].... The parties kept the property as a rental unit. Shortly before the trial in this matter, the parties sold it and kept the net sales proceeds of about $81,000 in escrow pending the resolution of their divorce.

12. In 1990, [Russell's] mother was diagnosed with cancer. As part of their estate planning, [Russell's] parents decided to gift approximately $400,000 to each of their three children:....

13. In 1992, [Russell's] parents gifted to [Russell] the $400,000 against his inheritance. This was in addition to and separate from the annual gifts to the parties. [Russell] received $150,000 in February 1992 and the $250,000 in August 1992.

14. On March 31, 1992, the parties purchased 3865 Mariposa Drive, Honolulu, Hawaii [hereinafter "the Mariposa Drive property"]. [Russell] used the $150,000 gift money which he received from his parents in February as down payment on the Mariposa Drive property. [Russell]

did not intend to make a gift of that money to the marital estate. The parties then borrowed [the] balance of about $546,000 which they refinanced ... in May 1993 due to lower interest rate.

15. In November 1992, the parties purchased the real property located at 59–585E Ke Iki Road, Haleiwa, Hawaii [Hawai'i].

16. The parties had first expressed an interest to purchase Ke Iki in 1990.... The parties, however, did not have sufficient funds. Consequently, [Russell's] parents purchased the property in their names only in 1990.

17. In 1992, the parties agreed to purchase Ke Iki from [Russell's] parents at a price which was a little less than the purchase price paid by [Russell's] parents plus approximately $117,000 of out of pocket expenses incurred by [Russell's] parents since their purchase.

18. The parties needed $300,000 as down payment in order to avoid a jumbo loan which would have a higher interest rate. [Russell] thus used the $250,000 gift from his parents as part of the down payment and borrowed an additional $50,000 from his parents. [Russell's] parents forwarded the total amount of $300,000 to [Russell]·in August 1992.

19. Similar to the $150,000 down payment on the Mariposa property, [Russell] intended the $250,000 as his additional capital contribution to the marital partnership; it was not intended as a gift. He fully expected the return of his capital contributions. This was especially important to him because this was part of his inheritance from his mother who passed away in November 1992.

20. ... In November 1992, [Russell] used the $300,000 as down payment on the Ke Iki Road property.

21. Thus, to complete the purchase of the Ke Iki Road property, the parties obtained a mortgage of $300,000 from Honolulu Mortgage and a loan of $166,948 from [Russell's] parents.

22. In December 1992, [Laura], feeling that her marriage was over and fearing for her future financial security, started depositing her pay checks into her own separate bank account. [Laura] stopped contributing to the parties' joint account and stopped making any payments on the parties' joint expenses....

23. Beginning in December 1992, [Russell] alone paid for the debts and expenses on the four real properties. From January 1, 1993, through December 31, 1995, [Russell] incurred $293,380 actual net out of pocket expenses therefor: $8,266 for Kamehameha Highway, $48,145 for Paopua Loop, $179,240 for Mariposa Drive, and $57,729.41 for Ke Iki Road. During that same time period, [Russell] advanced about $26,000 for [Laura's] separate expenses.

24. Prior to December 1992, [Laura] had discussed with [Russell] a business concept of a coffee shop where customers can listen to and purchase compact discs. In the spring of 1992, [Laura] invited her then best friend Meryl Hart from California to discuss the idea. Sometime during that summer, [Laura] and Meryl Hart agreed that Meryl would have exclusive management of the cafe and Dean Cunningham, who worked for [Laura] at Kapiolani Medical Center, would assist as an employee. [Laura] would continue to work full time as a nurse anesthesiologist to support the business....

* * *

26. ... Meryl Hart discovered that [Laura] was romantically involved with Dean Cunningham. Meryl Hart insisted that Dean Cunningham be discharged as an employee.... [Laura] told Meryl that she would not discharge Dean Cunningham but also refused to stop her romantic involvement with him. Meryl Hart at that point decided to terminate their business arrangement and eventually returned to California.

* * *

28. From December 1992 when [Laura] stopped contributing financially to the marital partnership until she moved out in May 1993, [Russell] continued to deposit

his income into the parties' joint account and paid all of their expenses. [Russell] was unaware that [Laura] was paying for Dean Cunningham's living expenses.

29. In May 1993, [Laura] voluntarily vacated from the mar[it]al residence and took the household effects and furnishings that she wanted.

30. In the same month, [Laura] informed [Russell] that as a "preemptive" measure she planned to file suit against Meryl Hart because of the latter's repeated requests for reimbursement and compensation for the loss she sustained from [Laura's] alleged breach of their business agreement and her threat of a lawsuit in California. [Laura] still did not disclose to [Russell] her affair with Dean Cunningham as the reason for her disagreement with Meryl Hart. Thus ignorant of the facts, [Russell] agreed with [Laura]. [Laura] filed suit against Meryl Hart in the First Circuit Court of the State of Hawaii [Hawai'i] in Civil No. 93–1737–04.

31. In July, ...,[Russell] was served with a third party complaint filed by Meryl Hart against him. Said complaint revealed [Laura's] affair with Dean Cunningham as the basis for the dispute between [Laura] and Meryl Hart. [Russell] eventually retained his own counsel to defend him in the civil lawsuit.

32. In July 1993, Dean Cunningham moved in with [Laura].

33. ... In July 1993, upon discovering that [Laura] was living with Dean Cunningham, [Russell] stated clearly to [Laura] that he had no interest in starting a coffee shop/compact disc business. [Laura] nonetheless pursued the idea on her own and employed Dean Cunningham to assist her.

34. In September, only as an accommodation, [Russell] reluctantly co-signed with [Laura] a fourteen-month lease for the latter's new coffee shop/compact discs business (hereinafter "CD Cafe"). [Russell] did this after [Laura] agreed that she would be solely responsible for any debts, expenses, and liabilities relating to CD Cafe.

35. Pursuant to the same agreement that [Laura] shall be solely responsible for the loan, [Russell] signed as a guarantor for [Laura's] $50,000 business loan with First Hawaiian Bank (hereinafter "FHB"). [Laura] reassured [Russell] of her sole responsibility....

\* \* \*

38. In December 1993, [Laura] opened CD Cafe for business....

39. In the early part of 1994, [Laura] borrowed from [Russell] $20,000 for CD Cafe.

\* \* \*

42. [Laura] ... closed CD Cafe in January 1995. She sold some of its equipment and kept others.

\* \* \*

44. In May 1995, [Laura] defaulted on the $50,000 FHB loan. This forced [Russell] as the guarantor to borrow $50,000 and pay off [Laura's] business loan.

\* \* \*

46. In September 1995, [Russell] settled with Meryl Hart on her third-party complaint against him. Altogether, [Russell] had incurred about $15,000 in attorney's fee and settlement costs to resolve the matter.

47. When [Russell] was about to be dismissed as a party from the civil lawsuit, [Laura] filed a motion to amend her complaint to name [Russell] as a[d]efendant in that civil action. In October 1995, the court denied [Laura's] motion to amend her complaint.

48. Shortly thereafter, [Laura] proceeded to trial against Meryl Hart. The court therein found that Meryl Hart was in breach of their contract and awarded [Laura] $872, the amount which the parties had advanced for Meryl Hart's round trip airfare from California to Hawaii [Hawai'i]. [Laura] then filed a motion for her attorney's fees in said action.

* * *

50. [Laura] has not yet filed her 1993 and 1994 income tax returns.

51. In 1993, [Russell's] gross earnings from his practice totaled $279,412. In 1994, [Russell's] earnings totaled $241,236. In 1995, [Russell's] estimated adjustable gross income would be slightly more than in 1994....

52. In 1993, [Laura's] gross income was $91,766. In 1994, her gross income was $128,059. In 1995, her gross income was $119,160....

53. [Russell's] current assets and debts are as follows: FHB (business) account of $1,276, FHB account of $3,031, FHB account of $1,256, 1987 BMW 325 of $7,100, 1965 Mercedes of $5,000, medical practice of $70,300, Smith Barney SEP account of $76,991 (with a $20,000 debt to Security Pacific Bank to fund said account) ..., Aetna 403–B account of $11,409 ..., American Savings IRA of $421 from before marriage, Minnesota Mutual IRA of $3,219 from before marriage, and a debt of $50,000 to FHB....

In addition, there are the four real properties: 61–274 Kamehameha Highway with a net market value of $73,183, 3865 Mariposa Drive with a net market value of – $1,303, 58–585E Ke Iki Road with a net market value of $24,574, and 573 Paopua Loop sales proceeds of $81,000 in escrow.

54. ... [Russell] has average gross monthly income of $20,850 and monthly expenses of $12,399, which nets [Russell] a negative cash flow of $1,175 per month after payment of his estimated income taxes.

55. [Laura's] current assets and debts are as follows: Bank of Hawaii account of $1,000, Bank of Honolulu account of $7,800, 1988 Volvo of $8,500, Bank of America IRA of $6,700, jewelry of $11,850, Anesthesia machine and electrolysis machine of $6,600, rugs of $6,000, computer of $1,500, CD Cafe equipment of $6,500, and various debts incurred after December 1992.

56. [Laura's] current income and expenses show that she has an average monthly income of $9,980 and her monthly expenses total about $4,150. Even after deducting her income taxes, [Laura] shows savings of more than $3,000 per month....

* * *

## CONCLUSIONS OF LAW

* * *

3. The $400,000 received by [Russell] from his parents in 1992 was a gift solely to [Russell] from his parents. It was not a gift to both parties. Thus, the $400,000 [Russell] used as down payment to purchase the Mariposa Drive real property and the Ke Iki Road real property consists of his capital contribution to the marital partnership.

4. The transfer of the Ke Iki Road real property from [Russell's] parents to the parties was a sale and not a gift.

5. If [Russell] were to be returned his capital contribution, not only would [Russell] be awarded all of the parties' assets but [Laura] would also need to reimburse [Russell] about $109,000, because of the current net market value of the marital estate.

6. In considering all of the relevant factors set forth in HRS § 580–47, the Court shall hereby deviate in [Laura's] favor....

* * *

13. The CD Cafe was a joint business. Accordingly, the $50,000 business was a joint loan and [Russell] shall be solely responsible for said loan....

* * *

15. [Laura] need not pay or reimburse [Russell] for the money he advanced after December 1992 on the parties' joint debts and other expenses on the four real properties of $293,380, the $20,000 loan from [Russell] to [Laura], and the $26,000 [Russell] paid for [Laura's] expenses.

16. For tax purposes, [Laura] shall be entitled to claim all depreciation and deductible expenses and shall also be solely responsible for all tax consequences in connection with 573 Paopua Loop property, including the 1995 rental income.

17. [Russell] shall be responsible for all tax consequences relating to 59–585E Ke Iki Road, 61–274C Kamehameha Highway, and 3865 Mariposa Drive, properties.

18. Each party shall be responsible for his or her own attorney's fees and costs incurred in this action.

\* \* \*

(All citations to exhibit numbers omitted.)

The Divorce Decree awarded the property and debts of the parties as follows:

TO RUSSELL:

| Item | Value |
| --- | --- |
| FHB Checking | $ 1,276 |
| FHB Savings | 3,031 |
| FHB Checking | 1,256 |
| 59–585 Ke Iki Road, Haleiwa | 385,000 |
| Mortgage | (291,426) |
| Debt to Russell's Father | ( 69,000) |
| 3865 Mariposa Drive, Honolulu | 545,000 |
| Mortgage | (546,303) |
| 61–274C Kamehameha Highway, Haleiwa | 189,000 |
| Mortgage | (115,817) |
| Medical Practice | 70,300 |
| Smith Barney SEP | 76,991 |
| Debt to Security Pacific Bank | ( 20,000) |
| Aetna 403–B | 11,409 |
| American Savings IRA | 421 |
| Minnesota Mutual IRA | 3,219 |
| 1965 Mercedes 220 | 5,000 |
| 1987 BMW 325 | 7,100 |
| Debt to FHB | ( 50,000) |
| TOTAL | $ 206,457 |

TO LAURA:

| Item | Value |
| --- | --- |
| Bank of Hawaii Checking | 1,000 |
| Bank of Honolulu Checking | 7,800 |
| Net from 573 Paopua Loop, Kailua | 81,000 |
| Bank of America IRA | 6,700 |
| Anesthesia Machine | 5,000 |
| Electrolysis Machine | 1,600 |
| Rugs | 6,000 |
| CD Cafe Equipment | 6,500 |
| Jewelry | 11,850 |
| Computer | 1,500 |
| 1988 Volvo Wagon | 8,500 |
| Account receivable, FOF No. 48 [1] | 872 |
| Various debts incurred post–12/1992 | ? [2] |
| TOTAL | $ 138,322 |

The Divorce Decree ordered that beginning 1993 the parties shall file separate tax returns, and each shall suffer or enjoy all tax consequences flowing from the real estate awarded to him or her.

The Divorce Decree further ordered that "[e]ach party shall pay his or her own attorney's fees and costs incurred in connection with this action."

## DISCUSSION

### *Laura's Points on Appeal*

1.

Under the Partnership Model, the Category 3 net market values (NMVs) are defined as follows:

> Category 3. The date-of-acquisition NMV, plus or minus, of property separately acquired by gift or inheritance during the marriage but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.

*Tougas v. Tougas,* 76 Hawai'i 19, 27, 868 P.2d 437, 445 (1994).

Laura challenges Findings of Fact (FsOF) Nos. 14 and 19 (but not 13), and Conclusions of Law (CsOL) Nos. 3 and 4, and contends that the family court erred when it decided that (a) the $150,000 and the $250,000 payments from Russell's parents to Russell were gifts to Russell and not to Russell and Laura, and (b) Russell's application of those funds as part of the purchase price of the Mariposa Drive property (*see* FOF No. 14) in joint names, and of the purchase price of the Ke Iki Road property (*see* FsOF Nos. 15–19) in joint names was not a gift from Russell to Laura or to the marital partnership.

(a)

■■■ "A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake

1. Defendant–Appellant Laura A. Wong (Laura) will receive proceeds from Civil No. 93–1737–04 if and when she collects on the judgment in her favor.

2. With respect to Laura's various debts incurred post-December 12, 1992, the family court did not enter any findings as to the identity of the various creditors or the amounts owed.

has been made." *State v. Okumura,* 78 Hawaiʻi 383, 392, 894 P.2d 80, 89 (1995) (citation omitted). Although there is substantial evidence in the record to support the challenged findings, Laura argues that we should have a definite and firm conviction that a mistake has been made. She contends that the family court disregarded all other circumstances surrounding the transfer of funds from Russell's parents to Russell, all of which overwhelmingly demonstrate that Russell's parents intended to make a gift to both Russell and Laura. Upon a review of the record, we do not have a definite and firm conviction that a mistake has been made. Thus, we conclude that the $400,000 gifted from Russell's father to Russell came into the marital partnership as Russell's Category 3 NMV contribution to the marital partnership.

#### (b)

■ It is the law that

[t]o constitute a gift, the essential elements are (1) donative intent, (2) delivery, and (3) acceptance.

\* \* \*

Generally, the burden of proving an alleged gift is on the donee. However, in cases of close kinship, there is a presumption that a gift was intended and the presumption must be rebutted by clear and convincing evidence.

*Almeida v. Almeida,* 4 Haw.App. 513, 517–18, 669 P.2d 174, 178–79 (1983) (citations omitted).

In *Gussin v. Gussin,* 73 Haw. 470, 836 P.2d 484 (1992), the

Wife argued that, although the $75,982 was Husband's separate property on the date of marriage, these assets were commingled in joint accounts and utilized to purchase the marital residence under joint title and were thus transmuted into marital assets. "Transmutation" is the conversion of separate property into marital property during marriage by expressed or implied acts. Wife contended that under transmutation, the evidence raised a rebuttable presumption of gift from Husband to Wife or to the marital estate, which Husband

failed to rebut by clear and convincing evidence.

*Id.* at 487, 836 P.2d at 492–94 (footnote omitted). In its opinion, the Hawaiʻi Supreme Court rejected the doctrine of transmutation.

■ After *Gussin,* the Partnership Model became the law. *See, Jackson v. Jackson,* 84 Hawaiʻi 319, 933 P.2d 1353 (App.1997). The question here is whether the Partnership Model resurrects the doctrine of transmutation in divorce cases. We conclude that it buries it even deeper. Under partnership law, a partner who invests money into partnership accounts and/or real and/or personal property into the partnership name or the names of the partners does not thereby gift the invested money and/or real and/or personal property to his/her partners. Hawaiʻi Revised Statutes (HRS) § 425–118(a) (1993) states as follows:

**Rules determining rights and duties of partners.** The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules:

(a) Each partner shall be repaid the partner's contributions, whether by way of capital or advances to the partnership property and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied; and must contribute towards the losses, whether of capital or otherwise, sustained by the partnership according to the partner's share of the profits.

■ We therefore conclude that in divorce cases involving the application of the Partnership Model, the transmutation rule does not apply, and the above-quoted *Almeida* presumption does not apply to transactions between marital partners. In other words, when one marital partner conveys Category 1 and/or Category 3 property to the other marital partner or to both marital partners, there is no presumption of a gift of the Category 1 and/or Category 3 net market value (NMV) and the marital partner who alleges the gift has the burden of proving a gift.

2.

In support of her next contention of error, Laura cites the rule that

> [i]f specific property has been separately owned continuously from the DOM [date of marriage] to the DOFSICOD [date of final separation in contemplation of divorce], and the NMV of that property on the DOFSICOD is no greater than its NMV on the DOM, then its value includable in Category 1 is its NMV on the DOFSICOD. Likewise, if a specific property has been separately owned continuously from the date of acquisition during the marriage to the DOFSICOD, and the NMV of that property on the DOFSICOD is no greater than its NMV on the date of acquisition during the marriage, then its value includable in Category 3 is its NMV on the DOFSICOD.

*Woodworth v. Woodworth*, 7 Haw.App. 11, 17, 740 P.2d 36, 40 (1987).

Although the above-quoted *Woodworth* rule remains valid, it needs amendment (a) to account for the subsequent abolishment of Category 6, *see Jackson v. Jackson*, 84 Hawai'i 319, 933 P.2d 1353 (App.1997), and (b) to make the rule clearer. As amended, with additions underlined and deletions in brackets, the *Woodworth* rule reads as follows:

> If a specific Category 1 property has been separately owned continuously from the DOM to the [DOFSICOD] DOCOEPOT [date of the conclusion of the evidentiary part of the trial], and the NMV of that property on the [DOFSICOD] DOCOEPOT is no greater than its NMV on the DOM, then its value includable in Category 1 is its NMV on the [DOFSICOD] DOCOEPOT. Likewise, if a specific Category 3 property has been separately owned continuously from the date of acquisition during the marriage to the [DOFSICOD] DOCOEPOT, and the NMV of that property on the [DOFSICOD] DOCOEPOT is no greater than its NMV on the date of acquisition during the marriage, then its value includable in Category 3 is its NMV on the [DOFSICOD] DOCOEPOT.

■ As amended, the rule is as follows:

> If specific Category 1 property has been separately owned continuously from the DOM to the DOCOEPOT, and the NMV of that property on the DOCOEPOT is no greater than its NMV on the DOM, then its value includable in Category 1 is its NMV on the DOCOEPOT. Likewise, if a specific Category 3 property has been separately owned continuously from the date of acquisition during the marriage to the DOCOEPOT, and the NMV of that property on the DOCOEPOT is no greater than its NMV on the date of acquisition during the marriage, then its value includable in Category 3 is its NMV on the DOCOEPOT.

■ As noted above, the $400,000 gifted from Russell's father to Russell was Russell's Category 3 property. The real estate in which it was invested is not Category 3 property. The $400,000 was not separately owned continuously from the DOM to the DOCOEPOT. The $400,000 was spent during the marriage. Therefore, the amended *Woodworth* rule does not apply. Moreover, even assuming the real estate in which the $400,000 was invested was Category 3 property, the amended *Woodworth* rule would not apply because the real estate was not "separately owned continuously from the date of acquisition during the marriage to the DOCOEPOT." From the beginning, the real estate was jointly owned.

■ Under the Partnership Model, "[t]he Category 1 and [Category] 3 NMVs are the 'partner's contributions' to the Marital Partnership Property that, assuming all valid and relevant considerations are equal, are repaid to the contributing spouse[.]" *Hussey v. Hussey*, 77 Hawai'i 202, 207, 881 P.2d 1270, 1275 (App.1994).

When this marital partnership began, Russell brought in $23,091 and Laura brought in minus $15,663. *See* FOF No. 6. During the marriage, Russell contributed an additional $400,000 to the marital partnership. The marital partnership decided what to do with the finances of the marital partnership. In this case, the marital partners invested the $400,000 into real estate. Under the Partnership Model, subject to the amended *Woodworth* rule stated above, the marital

partners profit equally from gain and they suffer equally from loss.

Laura contends that the rule that the decline in the value of the real estate purchased with the Category 3 cash during the marital partnership does not reduce Russell's Category 3 NMV shifts the entire risk of loss to the noncontributing party. We disagree. Laura traces the application of the Category 3 $400,000 to the purchase of specific property that declined in value. The Partnership Model, however, does not trace in this way. It views the marital partnership in its entirety. In this case, since the marital partnership ended with a NMV which was less than $423,091, Russell leaves the partnership with less than his $423,091 capital contribution. Thus, it cannot be said that Laura suffers the entire risk of loss. In fact, Laura leaves the marital partnership with much more than her –$15,663 capital contribution.

### 3.

The Partnership Model requires the family court, when deciding the division and distribution of the Marital Partnership Property[3] of the parties part of divorce cases, to proceed as follows: (1) find the relevant facts; start at the Partnership Model Division and (2)(a) decide whether or not the facts present any valid and relevant considerations authorizing a deviation from the Partnership Model Division and, if so, (b) itemize those considerations; if the answer to question (2)(a) is "yes," exercise its discretion and (3) decide whether or not there will be a deviation; and, if the answer to question "3" is "yes," exercise its discretion and (4) decide the extent of the deviation.

*Jackson v. Jackson*, 84 Hawai'i 319, 332, 933 P.2d 1353, 1366 (1997) (footnote in original).

In her Reply Brief, Laura argues in relevant part as follows:

In [Russell's] Answering Brief, pages 8 and 9, [Russell] attempts to demonstrate

that [Laura] "leaves the marriage with assets in excess of $142,250.00".[4] This is an absurd distortion. First of all, [Russell] completely ignores [Laura's] genuine and bonafide debts of $38,738.00, as reflected on her Asset and Debt Statement received by the Court as evidence on her behalf during the proceedings. [Russell] argues that such debts should not be considered as debts because they were largely used for legal fees and litigation support services.

(Footnote added.)

Laura does not cite the exhibit number of "her Asset and Debt Statement received by the Court as evidence on her behalf during the proceedings" and we did not locate it in the exhibits in evidence.

As noted above, the family court deviated from the Partnership Model Division in favor of Laura. In his appeal, Russell does not challenge the family court's authority to deviate. Therefore, it is not an issue in this appeal.

Laura contends, however, that the family court inadequately deviated, failed to adequately consider the parties' respective post-divorce conditions, and left the parties in grossly disproportionate post-divorce conditions. We conclude that Laura failed her burden on appeal of showing that the family court abused its discretion when it declined to deviate further.

### 4.

On January 17, 1996, Laura filed her Motion for Leave to Amend Defendant's Position Statement to add a request for "an order that [Russell] should pay transitional alimony to [Laura] in the amount of FIVE THOUSAND AND NO/100 DOLLARS ($5,000.00) for a period of two (2) years, commencing February, 1996." The reason stated for the motion was the fact that "it appears that virtually the only way to achieve relative post-divorce parity between the parties is to

---

3. In *Hussey v. Hussey*, 77 Hawai'i, 202, 206–07, 881 P.2d 1270, 1274–75 (App.1996), we distinguished between Premarital Separate Property, Marital Separate Property, and Marital Partnership Property.

4. This total for Laura listed by plaintiff-appellee Russell D. Wong (Russell) is more than the $137,450 total we have reported because Russell's total includes "$1,800" for a 1985 Toyota and "$3,000" for "Household Effects."

require [Russell] to provide substantial transitional alimony to [Laura]."

In this appeal, Laura argues that the family court: (1) should have reserved its decision until the conclusion of trial; (2) disregarded and/or inadequately considered the substantial prejudice and detriment to Laura in not being able to seek spousal support/alimony; and (3) disregarded and/or inadequately considered the argument that Russell's last minute disclosure to Laura of his position regarding the substantial decline in value of the marital real property justified Laura's request for spousal support/alimony, especially where Russell was seeking an award of virtually the entire remaining marital estate as a refund of his capital contributions thereto.

█ Laura presents two possibilities. First, she seeks an order requiring Russell to make periodic payments to her in consideration of property distributed to him so as to achieve the ultimate goal of "relative post-divorce parity between the parties[.]" We conclude that this statement of the ultimate goal of marital property distribution is wrong as a matter of law.

Second, Laura seeks an order requiring Russell to pay her true spousal support/alimony. When deciding the issue of spousal support/alimony,

> [t]he first relevant circumstance is the payee's need. What amount of money does he or she need to maintain the standard of living established during the marriage? The second relevant circumstance is the payee's ability to meet his or her need without spousal support. Taking into account the payee's income, or what it should be, including the net income producing capability of his or her property, what is his or her reasonable ability to meet his or her need without spousal support? The third relevant circumstance is the payor's need. What amount of money does he or she need to maintain the standard of living established during the marriage? The fourth relevant circumstance is the payor's ability to pay spousal support. Taking into account the payor's income, or what it should be, including the income producing capability of his or her property, what is

his or her reasonable ability to meet his or her need and to pay spousal support?

\* \* \*

> When answering any of the above questions, the following two rules apply: Any part of the payor's current inability to pay that was unreasonably caused by the payor may not be considered and must be ignored. Any part of the payee's current need that was caused by the payee's violation of his or her duty to exert reasonable efforts to attain self-sufficiency at the standard of living established during the marriage may not be considered and must be ignored. *Saromines v. Saromines*, 3 Haw. App. 20, 641 P.2d 1342 (1982).

*Vorfeld v. Vorfeld*, 8 Haw.App. 391, 402–03, 804 P.2d 891, 897–98 (1991).

█ We decide that the family court did not abuse its discretion when it denied Laura's motion. First, Laura's motion was filed late in the proceedings. Second, the facts show that Laura had a reasonable ability to meet her need, "transitional" need included, without spousal support/alimony.

5.

Laura contends that the family court abused its discretion when it entered the March 25, 1996 Order Granting Rule 68 Motion. Hawai'i Family Court Rule 68 states in relevant part as follows:

> If the decree or order finally obtained by the offeree is patently not more favorable as a whole than the offer, the offeree must pay the costs, including reasonable attorney's fees incurred after the making of the offer, unless the court shall specifically determine that such would be inequitable in accordance with the provisions of HRS section 580–47, as amended. The fact that an offer is made but not accepted does not preclude a subsequent offer.

█ As noted above, the Divorce Decree orders that "[e]ach party shall pay his or her own attorney's fees and costs incurred in connection with this action." Laura filed her Notice of Appeal on March 15, 1996, and Russell filed his Notice of Cross–Appeal on

March 25, 1996 at 1:13 p.m. Russell filed Plaintiff's Rule 68 Motion on March 14, 1996, and it was heard on March 25, 1996. The March 25, 1996 Order Granting Rule 68 Motion states in relevant part that "[Laura] shall pay to [Russell] the sum of $40,000 for [Russell's] reasonable attorney's fees and costs incurred after the making of all three offers of settlement." The March 25, 1996 Order Granting Rule 68 Motion was filed after both the Notice of Appeal and the Notice of Cross–Appeal were filed. In other words, appellate jurisdiction attached before the March 25, 1996 Order Granting Rule 68 Motion was entered. While a case is on appeal, the lower court lacks jurisdiction to decide any questions pertaining to attorney fees arising out of or relating to the matter on appeal. *Hoddick, Reinwald, O'Connor & Marrack v. Lotsof,* 6 Haw.App. 296, 300, 719 P.2d 1107, 1111 (1986); *Wisdom v. Pflueger,* 4 Haw.App. 455, 461, 667 P.2d 844, 849 (1983); *D'Elia v. Association of Apartment Owners of Fairway Manor,* 2 Haw.App. 350, 632 P.2d 298 (1981). Therefore, we conclude that the March 25, 1996 Order Granting Rule 68 Motion is void because the family court lacked jurisdiction to enter it.

### Russell's Points on Appeal

First, Russell challenges paragraph 4.D. of the Divorce Decree and COL No. 3 and contends that the family court abused its discretion when it decided that Russell should be responsible for Laura's $50,000 FHB business loan reported in FOF No. 35.

Second, notwithstanding the fact that the marital partnership continued until the January 24, 1996 DOCOEPOT, *Jackson v. Jackson,* 84 Hawai'i 319, 335, 933 P.2d 1353, 1369 (App.1997), and Russell's expenditures during the marital partnership were marital partnership expenditures, Russell challenges COL No. 15 and contends that the family court abused its discretion when it failed to credit Russell for the money he contributed to the marital estate and cash advanced to Laura after December 1992.

Third, Russell challenges paragraph 4.E.(3)(a) of the Divorce Decree and COL No. 16 and contends that the family court abused its discretion when it did not allow Russell to claim all depreciation and deductible expenses related to the 573 Paopua Loop property for the period from 1993 through 1995.

The relevant standard of review is that

[t]he family court possesses wide discretion in making its [discretionary] decisions and those decisions will not be set aside unless there is a manifest abuse of discretion.

*In Interest of Doe,* 77 Hawai'i 109, 115, 883 P.2d 30, 36 (1994) (citation omitted).

Under [the abuse of discretion] standard of review, the appellate court is not authorized to disturb the family court's decision unless (1) the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant; (2) the family court failed to exercise its equitable discretion; or (3) the family court's decision clearly exceeds the bounds of reason.

*Bennett v. Bennett,* 8 Haw.App. 415, 426, 807 P.2d 597, 603 (1991).

With respect to each of Russell's three points stated above, we decide that Russell failed to meet his burden on appeal of showing that the family court abused its discretion in making its decision.

### CONCLUSION

Accordingly, we affirm the family court's February 16, 1996 Divorce Decree and its June 21, 1996 Findings of Fact and Conclusions of Law and decide that the March 25, 1996 Order Granting Rule 68 Motion is void because the family court lacked jurisdiction to enter it.