**NOT FOR PUBLICATION IN WEST'S HAWAI‘I REPORTS AND PACIFIC REPORTER**

**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-19-0000324**
**28-OCT-2021**
**08:09 AM**
**Dkt. 177 SO**

NO. CAAP-19-0000324

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI‘I


JW, Plaintiff-Appellant, v.
LW, Defendant-Appellee


APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-D NO. 16-1-0008)


SUMMARY DISPOSITION ORDER
(By: Ginoza, Chief Judge, Leonard and Wadsworth, JJ.)

Plaintiff-Appellant JW (**JW** or **Mother**) appeals from the Family Court of the First Circuit's (**Family Court**)[1] March 7, 2019 Decree Granting Absolute Divorce and Awarding Child Custody (**Divorce Decree**).

JW raises three multi-faceted points of error on appeal, contending that the Family Court: (1) abused its discretion in awarding JW reduced spousal support and for a shorter term than requested; (2) abused its discretion in denying JW's request to relocate with the parties' children and in its related joint physical custody and child support decisions; and

---

[1] The Honorable Kevin T. Morikone presided.

(3) erred in (a) failing to attribute marital waste to Defendant-Appellee LW (**LW** or **Father**) and (b) determining that LW was entitled to a Category 1 credit for premarital house payments.

Upon careful review of the record and the briefs submitted by the parties, and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve JW's points of error as follows:

(1)  JW argues that the Family Court abused its discretion when it ordered spousal support in the amount of $2,500 per month for five years, instead of $2,900 per month for six years.  Hawaii Revised Statutes (**HRS**) § 580-47(a) (2018) requires that the Family Court consider the following when making orders for spousal support:

> the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, the burdens imposed upon either party for the benefit of the children of the parties, the concealment of or failure to disclose income or an asset, or violation of a restraining order issued under section 580-10(a) or (b), if any, by either party, and all other circumstances of the case.
>
> The Family Court also must consider:
>
> (1)   Financial resources of the parties;
> (2)   Ability of the party seeking support and maintenance to meet his or her needs independently;
> (3)   Duration of the marriage;
> (4)   Standard of living established during the marriage;
> (5)   Age of the parties;
> (6)   Physical and emotional condition of the parties;
> (7)   Usual occupation of the parties during the marriage;
> (8)   Vocational skills and employability of the party seeking support and maintenance;
> (9)   Needs of the parties;
> (10) Custodial and child support responsibilities;
> (11) Ability of the party from whom support and maintenance is sought to meet his or her own needs while meeting the needs of the party seeking support and maintenance;

(12)    Other factors which measure the financial condition
        in which the parties will be left as the result of
        the action under which the determination of
        maintenance is made; and
(13)    Probable duration of the need of the party seeking
        support and maintenance.

Id.

When deciding the issue of spousal support:

The first relevant circumstance is the payee's need.
What amount of money does he or she need to maintain the
standard of living established during the marriage?  The
second relevant circumstance is the payee's ability to
meet his or her need without spousal support.  Taking
into account the payee's income, or what it should be,
including the net income producing capability of his or
her property, what is his or her reasonable ability to
meet his or her need without spousal support?  The third
relevant circumstance is the payor's need.  What amount
of money does he or she need to maintain the standard of
living established during the marriage?  The fourth
relevant circumstance is the payor's ability to pay
spousal support.  Taking into account the payor's income,
or what it should be, including the income producing
capability of his or her property, what is his or her
reasonable ability to meet his or her need and to pay
spousal support?

         . . . .

        When answering any of the above questions, the
following two rules apply:  Any part of the payor's
current inability to pay that was unreasonably caused by
the payor may not be considered and must be ignored.  Any
part of the payee's current need that was caused by the
payee's violation of his or her duty to exert reasonable
efforts to attain self-sufficiency at the standard of
living established during the marriage may not be
considered and must be ignored.

Wong v. Wong, 87 Hawaiʻi 475, 485, 960 P.2d 145, 155 (App. 1998)

(citations and brackets omitted); accord Vorfeld v. Vorfeld, 8

Haw. App. 391, 804 P.2d 891 (1991) (which was cited by the Family

Court in this case).

        In its November 29, 2018 Decision and Order (**Decision

and Order**), as well as in its June 25, 2019 Findings of Fact and

Conclusions of Law (**FOFs/COLs**), the Family Court expressly states

that its alimony (spousal support) determination was based on, *inter alia*, the factors enunciated in HRS § 580-47(a) as well as the analysis set forth in the case law, and JW does not persuasively argue otherwise.

Instead, JW primarily argues, in essence, that the Family Court did not give proper weight to her testimony regarding her work history, education, and financial needs. For example, JW points to her desire to finish college in order to improve her earning capacity. However, as noted by LW, JW took no steps to continue her education or obtain any employment during the pendency of the divorce proceedings, and JW points to no testimony or other evidence supporting a conclusion that the Family Court's determination that five years – as opposed to six years – of spousal support, in light of the applicable considerations, was an abuse of discretion. JW further argues that LW had the means to pay spousal support in the additional amount requested because his claimed personal needs, plus child support and the requested alimony, would be "just over his stated take-home pay" and LW could trim some of his "exaggerated" expenses. It is the purview of the Family Court to give weight and assess credibility of all of the testimony and other evidence, in light of both parties' arguments and the required factors, and determine an appropriate balancing of the standard of living of both parents. It appears from the record that the

4

Family Court did so in this case and we cannot conclude that the Family Court abused its discretion in so doing.

JW also argues that there was a dearth of evidence supporting an imputation of income to her for the purposes of the spousal support calculation. In conjunction with JW's argument that child support was improperly calculated, JW further argues that the Family Court erred in its imputation of income in the amount of $1,751.

The Family Court applied the 2014 Hawaiʻi Child Support Guidelines (**Guidelines**) provision concerning imputed income. Section V.J.3. of the Guidelines states:

> **IMPUTED INCOME** may be used when a parent is not employed full-time or is employed below full earning capacity. The reasons for this limitation must be considered.
>
> If a parent's income is limited in order to care for children to whom the parents owe a joint legal responsibility, at least one of whom is 3 years of age or younger, then no additional income will be imputed to that parent. If all of the subject children are over 3 years of age, and the parent who receives support is mentally and physically able to work, and remains at home and does not work, then thirty (30) hours or less of weekly earnings at the minimum wage may be imputed to that parent.[42]
>
> If a parent's income is limited for any other reason, the parent's income will be determined according to his or her income capacity in the local job market, considering both the reasonable needs of the children and the reasonable work aspirations of the parent.[43]
>
> [42] See § 576D-7(a)(9).
> [43] Cleveland v. Cleveland, 1 Haw. App. 187, 616 P.2d 1014 (1980).

Guidelines (Section V.J.3.) at 20-21, 24 (format altered).

In COL 21, the Family Court concluded that: "Mother is currently unemployed for reasons not related to caring for a child 3 years of age or younger to whom the parents owe a joint

legal responsibility." Mother does not argue that this particular conclusion is wrong. However, in COL 22, the Family Court further concluded that: "Mother's income should be determined/imputed according to her income capacity in the local job market, considering the reasonable needs of the parties' 3 sons and the reasonable work aspirations of Mother." The Family Court's conclusion as to Mother's income capacity in the local job market is supported by, *inter alia*, FOFs 80 - 85, which are supported by the evidence in the record. Nevertheless, Mother argues, both in the Family Court and on appeal, that she has stayed home to take care of the parties' children. The Family Court entered no FOFs or COLs as to why it imputed income at Mother's income capacity in the local job market, as opposed to imputing income at "thirty (30) hours or less of weekly earnings at the minimum wage."

We recently discussed these alternative grounds and methods for imputing income to a parent who is not employed full-time or is employed below full earning capacity, as follows:

> [T]he consideration of imputed income has three parts. The first part provides that imputed income "may" be used in one of two circumstances: (1) when a parent is not employed full-time; or (2) when a parent is employed below "full earning capacity." [Guidelines] at 20. In both instances, imputed income is plainly discretionary. The Guidelines indicate that the decision-maker "may" in one of these circumstances, enter a support order that is not based on a parent's actual income, but it is not a mandate. Id. The Guidelines further provide that "[t]he reasons for this limitation must be considered," echoing the intent of the Guidelines to apply the standard calculations in the vast majority of cases, and providing that even if a parent's employment situation falls below full earning capacity, the reasons for the limited employment must be considered. Id. (emphasis added). In context, this supports the conclusion

that imputed income is the exception, not the rule, even when one of the two circumstances arises, and we so hold.

The second part deals with the specific situation of a custodial parent staying home to care for one or more of the parties' children to whom they owe a joint legal responsibility. Id. If there is a child 3 years of age or younger, no additional income will be imputed. If the child or children are older, and other specified facts are demonstrated, then earnings for thirty hours or less, at minimum wage, *may* be imputed to the stay-at-home parent. Id. [W]e note this as one of the two circumstances that may support imputed income, and further note that this is the only circumstance that is directly supported by statute. As referenced in footnote 42 of the Guidelines, HRS § 576D-7(a)(9) provides that the Guidelines may include a consideration that "[i]f any obligee parent (with a school age child or children in school), who is mentally and physically able to work, remains at home and does not work, thirty (or less) hours of weekly earnings at the minimum wage may be imputed to that parent's income."

The third part is plainly intended to apply after a determination that a parent is "employed below full earning capacity" for any reason other than care of a joint child, and after the reasons for the limited employment – *i.e.*, below full earning capacity – are considered. Guidelines at 20-21. It states that in that situation, the parent's income will be determined – *i.e.*, may be imputed to be an amount different than his or her actual income – according to three factors: (1) the parent's income capacity in the local job market; (2) the reasonable needs of the children; and (3) the reasonable work aspirations of the parent. Id. at 21. We note that the authority identified in the Guidelines for this alternative basis for imputed income is an Intermediate Court of Appeals (**ICA**) case, Cleveland v. Cleveland, 1 Haw. App. 187, 616 P.2d 1014 (1980), not a statutory provision.

In Cleveland, the obligor-father argued that a family court's child support order must be based on the payor's present ability to pay child support. Id. at 191-92, 616 P.2d at 1017. The ICA rejected the father's argument and held:

> We hold that in ordering child support, the family court may consider what the payor is capable of earning if the payor attempts in good faith to secure proper employment, where the payor is temporarily unemployed or is engaged in work from which the payor does not receive the amount he or she is capable of earning in other fields of endeavor.
>
> We further hold that the court may consider the size of the payor's estate and his or her net worth.

Id. at 192, 616 P.2d at 1017 (citations omitted; emphasis added).

7

> Various aspects of the ICA's analysis in <u>Cleveland</u> do not square up with the standardized determinations of child support under the Guidelines, which were adopted years after the <u>Cleveland</u> decision.  Nevertheless, the drafters of the Guidelines expressly embraced the ICA's holding that the family court (or administrative agency) *may* consider "what the payor is capable of earning <u>if the payor attempts in good faith to secure proper employment</u>."  <u>Id.</u> (emphasis added).

<u>CH v. Child Support Enf't Agency</u>, CAAP-19-0000647, 2021 WL 2430809, *15-16 (Haw. App. June 15, 2021) (Op.) (footnote omitted).

In this case, the Family Court did not abuse its discretion in determining that income should be imputed to Mother based on the evidence in the record and the Family Court's FOFs. However, the Family Court made no findings or conclusions supporting its decision to apply the third part of Section V.J.3. of the Guidelines, as opposed to the second alternative of the second part of this Section - *i.e.*, the alternative concerning parents of children over 3 years of age, who are mentally and physically able to work and remain at home to care for children to whom the parents owe a joint legal responsibility.  In short, the Family Court did not make findings as to the reason for Mother's lack of income.[2]  As there are insufficient findings to support the Family Court's determination to apply the third part of Section V.J.3. of the Guidelines to impute income to JW, we

---

[2]     Father's position appears to be that, in light of the 50/50 custody arrangement ordered by the Family Court, Mother's unemployment should not be attributed to her remaining at home to care for their children. However, as the Family Court has not made the necessary findings concerning the reason(s) Mother's income was limited, we express no opinion as to whether the record supports any such findings or resulting conclusion.

must vacate the determination of spousal support based in part on such imputed income and remand this case for further findings and conclusions concerning imputed income and spousal support, to the extent that it is based on such imputed income.

(2) Mother argues that the Family Court abused its discretion in denying Mother's proposed relocation of the parties' children, ordering joint physical custody, and ordering Father to pay $2,499 monthly child support.

HRS § 571-46(a) (2018) provides, in part, that the family court should award custody of a minor child to "either parent or to both parents according to the best interests of the child, and the court also may consider frequent, continuing, and meaningful contact of each parent with the child unless the court finds that a parent is unable to act in the best interest of the child[.]" HRS 571-46(b) (2018) provides that in determining the "best interest of the child," the family court "shall consider, but not be limited to," sixteen factors, including:

> (3) The overall quality of the parent-child relationship;
> (4) The history of caregiving or parenting by each parent prior and subsequent to a marital or other type of separation;
> (5) Each parent's cooperation in developing and implementing a plan to meet the child's ongoing needs, interests, and schedule; . . .
> (6) The physical health needs of the child;
> (7) The emotional needs of the child;
> (8) The safety needs of the child;
> (9) The educational needs of the child;
> . . . .
> (11) Each parent's actions demonstrating that they allow the child to maintain family connections through family events and activities; . . .

9

> (12)  Each parent's actions demonstrating that they
>        separate the child's needs from the parent's
>        needs; [and]
>  . . . .
> (15)  The areas and levels of conflict present
>        within the family[.]

The Family Court is "granted broad discretion to weigh the various factors involved, with no single factor being given presumptive paramount weight, in determining whether the standard has been met."  Fisher v. Fisher, 111 Hawaiʻi 41, 50, 137 P.3d 355, 364 (2006).

Mother first argues that the Family Court failed to consider the HRS § 571-46(b) factors in determining Children's best interests and instead relied "on a single factor" in HRS § 571-46(a)(1):  whether Children would have "frequent, continuing, and meaningful contact" with Father.  Mother specifically points to COLs 2-6, which state:

> Mother's Proposed Relocation
>
> 2.    Hawaii Revised Statutes Section 571-46(a)(1)
>       provides in its entirety, "Custody should be
>       awarded to either parent or to both parents
>       according to the best interests of the child, and
>       the *court also may consider frequent, continuing,
>       and meaningful contact of each parent with the
>       child* unless the court finds that a parent is
>       unable to act in the best interest of the child."
>       (emphasis added in italics).
>
> 3.    The sole issue in a relocation case is the
>       children's best interests.  Fisher v. Fisher, 111
>       Hawaiʻi 41, 137 P.3d 355 (2006) (citing Maeda v.
>       Maeda, 8 Haw. App. 139, 143, 794 P.2d 268, 270
>       (1990) and In re Jane Doe, 7 Haw. App. 547, 558,
>       784 P.2d 873, 875 (1989)).
>
> 4.    If Mother was allowed to relocate the parties' 3
>       sons to California, then the parties' 3 sons would
>       not have frequent, continuing, and meaningful
>       contact with Father.

5.      It is not in the parties' 3 sons' best interests for them to not have frequent, continuing, and meaningful contact with Father.

6.      After careful consideration of the case law and the standards, considerations, and procedures contained in Hawaii Revised Statutes (HRS) Section 571-46, along with the credible and reliable evidence adduced at trial, the Court concludes that it is in the best interests of the children to deny Mother's request to relocate the children to the state of California.

Mother's argument lacks merit.  First, the Family Court is not required to expressly discuss each of the HRS § 571-46(b) factors in custody decisions.  See RC v. MC, CAAP-15-0000592, 2019 WL 338344, *3 (Haw. App. Jan. 28, 2019) (mem. op.).  Second, while the COLs regarding relocation focus on Children's "frequent, continuing, and meaningful contact" with Father, the Decision and Order states, *inter alia*, that "the sole issue in a relocation case is the children's best interest," and FOFs indicate that the Family Court considered, *inter alia*, Children's "physical, emotional, and educational needs":

Mother's Proposed Relocation

13.     After the Fact Finder was discharged on May 25, 2017, Mother filed a Notice Of Change Of Position And Request To Relocate With The Children on August 16, 2017.

14.     Mother initially testified that she wanted to relocate the parties' 3 sons to California because things were worse than ever in terms of conflict in her household.

15.     Mother acknowledged that some of their oldest son's behaviors existed before the parties' physical separation, and that their oldest son could have a negative attitude or be upset with her as the result of her not letting him do things, including spend more time with Father.

16.     Mother acknowledged that she started having problems with the parties' middle son in her household, and that he could be upset with her because she did not take him to baseball practices

11

and games, and then she did not take him to soccer practices and games.

17. Mother subsequently testified that after the parties' middle son was allowed to change soccer teams, then there was a big switch in the family dynamic for the boys and things were better in her household.

18. Mother also testified that she wanted to relocate to California to be close to her family and friends and for financial reasons.

19. There is no substantial and material change in circumstances that supports Mother relocating the parties' 3 sons to California.

20. Mother testified about general *protective factors* related to all 3 sons if she was allowed to relocate them to California. Father testified about specific *risk factors* related to each of the parties' 3 sons if Mother was allowed to relocate them to California. Mother acknowledged on direct examination that she thinks it is going to be hard for the boys to adjust to living in California. Mother did not refute Father's testimony about specific risk factors related to each of the parties' 3 sons.

21. Father's testimony about the specific risks to each of the parties' 3 sons' physical, emotional, and educational needs if Mother was allowed to relocate them to California outweighed Mother's testimony about the general benefits for the parties' 3 sons if she was allowed to relocate them to California.

Mother also argues that the Family Court "factually erred" in denying her proposed relocation and awarding Father joint physical custody. Specifically, Mother cites, *inter alia*, portions of her trial testimony and Nicole Cummings's (**Cummings**) second report and testimony and contends that such evidence "contradict[s]" the Family Court's findings and conclusions. Mother also argues that the Family Court erroneously relied on Marvin Acklin's (**Acklin**) opinions to disregard Cummings's testimony and second report because Acklin's testimony was irrelevant and therefore inadmissible.

One of the "touchstones of admissibility for expert testimony under HRE 702" is relevance. State v. Vliet, 95 Hawaiʻi 94, 106, 19 P.3d 42, 54 (2001). In determining relevancy, "a trial courts' function is akin to the relevancy analysis adopted in applying HRE Rules 401 [] and 402[.]" Id. HRE Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." See also CP v. JO, CAAP-16-0000680, 2017 WL 5899874, *4 (Haw. App. Nov. 30, 2017) (mem. op.) ("[R]elevant evidence in a child custody hearing is evidence that has a tendency to make the existence of facts regarding the best interests of the child more or less probable."). Evidence which is not relevant is not admissible. HRE Rule 402.

Mother contends that Acklin's testimony about Cummings's reports is irrelevant because, while Cummings was a "fact-finder/investigator," Acklin's review of Cummings's work was premised on what was appropriate for a custody evaluator. First of all, determinative fact-finding is the role of the Family Court and, while HRS § 571-46.4 (2018) permits the Family Court to require an investigation and report concerning facts related to custody, the appointment of a child evaluator or a fact-finding investigator does not bind the Family Court in its decision-making, as discussed below. Thus, to the extent that

13

Mother's relevance argument is based on Cummings's appointment as a "fact-finder," it is without merit.

Mother also argues that Acklin's testimony regarding education and training for custody evaluators was irrelevant because "[t]he law of the case is that the court-appointed expert for custody is Ms. Cummings." However, the record indicates the Family Court did not rely on Acklin's testimony as to general qualifications for custody evaluators; specifically, the Family Court's FOFs and COLs did not discuss whether Cummings was qualified to conduct custody investigations or make custody recommendations. Moreover, to the extent Mother contends that the stipulated order appointing Cummings shields Cummings's reports from scrutiny by another expert, such a contention runs counter to case law granting family courts discretion in considering custody recommendations. See In re Doe, 95 Hawaiʻi 183, 190, 20 P.3d 616, 623 (2001) (stating that the family court has "much leeway" in its examination of reports concerning a child's care, custody, and welfare, and if its determinations are supported by the record, they must stand on appeal); MHL v. HJKL, CAAP-14-0000697, 2016 WL 806200, *3 (Haw. App. Mar. 1, 2016) (SDO) (stating that the custody evaluator's "recommendation is not binding on the family court, and is only considered part of the evidence of the best interests of the Child"). In sum, Mother's arguments that Acklin's testimony was irrelevant and contrary to the law of the case lack merit.

Mother cites various portions of her testimony and Cummings's second report and testimony to argue that the Family Court clearly erred and abused its discretion in its determinations regarding whether relocation was in the best interests of the parties' children.  However, there is substantial evidence in the record to support the Family Court's determinations regarding relocation and physical custody.  As noted, the FOFs regarding Mother's proposed relocation included that:  (1) Mother testified that she wanted to relocate because "things were worse than ever in terms of conflict in her household;" (2) Mother acknowledged that some of NW's behaviors existed before the parties' separation and that NW could have a negative attitude resulting from her not letting him do things, including spending more time with Father; (3) Mother acknowledged that she started having problems with TW and that he could be upset with her because she did not take him to baseball practices and games, and then did not take him to soccer practices and games, and (4) Mother later testified that after TW changed soccer teams, things had improved in her household.  These findings are supported in the record.

The Family Court also noted Mother's testimony that she wanted to relocate to California to be close to her family and friends and for financial reasons, and found that:

> 20.  Mother testified about general *protective factors* related to all 3 sons if she was allowed to relocate them to California.  Father testified about specific *risk factors* related to each of the

parties' 3 sons if Mother was allowed to relocate them to California. Mother acknowledged on direct examination that she thinks it is going to be hard for the boys to adjust to living in California. Mother did not refute Father's testimony about specific risk factors related to each of the parties' 3 sons.

21. Father's testimony about the specific risks to each of the parties' 3 sons' physical, emotional, and educational needs if Mother was allowed to relocate them to California outweighed Mother's testimony about the general benefits for the parties' 3 sons if she was allowed to relocate them to California.

Mother acknowledged that "of course I think it's going to be hard" for Children to adjust to living in California, and Father testified about the negative impacts that relocation could have on each of the Children; Mother's closing arguments did not address Father's testimony regarding such negative impacts, and she does not contend on appeal that she refuted such testimony. Moreover, finding that Father's testimony outweighed Mother's testimony was "the province of" the Family Court as trier of fact, and this court will not disturb it based on this record. See Fisher, 111 Hawaiʻi at 46, 137 P.3d at 360 (citation omitted). The Family Court's FOFs as to Mother's relocation request thus do not appear clearly erroneous and its decision to deny Mother's request to relocate the parties' children to California was not an abuse of discretion.

The Family Court's FOFs regarding physical custody are extensive (FOFs 35-76), they are supported by evidence in the record or reasonable inferences therefrom, and are not clearly erroneous. Based on the Family Court's factual findings and credibility findings, we conclude that the Family Court did not

abuse its discretion in concluding it was in Children's best interest to award joint physical custody of Children to Mother and Father.

Mother argues that the Family Court erred in awarding her $2,499 in child support because the Family Court did not correctly calculate Father's income and improperly imputed income to Mother. As discussed above in conjunction with Mother's arguments concerning child support, there are insufficient findings to support the Family Court's determination to apply the third part of Section V.J.3. of the Guidelines to impute income to JW. Thus, we must vacate the determination of child support to the extent that it was based on such imputed income and remand this case for further findings and conclusions concerning imputed income and child support.

With respect to the calculation of child support, Mother also argues that the Family Court erred in its determination of Father's income. The Family Court found that Father's monthly income "is $23,666 based upon 2017 tax information plus $618 per month for use of his business vehicle for a total of $24,284." Mother argues that the Family Court should have found Father's gross monthly income to be "well over" $30,000.

Father testified that his 2017 taxable income was $284,000 ($284,000/12 months = $23,666) and Mother acknowledges on appeal that Father's 2017 monthly gross income (not including

the "business vehicle") was $23,666.  Mother contends, however, that "it would have been more correct" to use Father's 2018 year-to-date compensation figures because Father "consistently claimed" to use year-to-date averages "to create [his] court financials, and because [Father] claimed he used 2018 numbers" in his income and expense report admitted into evidence.  Mother states that Father's 2018 year-to-date figures "yielded $33,380 take home before taxes and medical," however, it is unclear as to how she calculated that figure and she cites no authority supporting her argument that the Family Court clearly erred or abused its discretion in its calculation of Father's income.  The evidence in the record shows variable income and business expenses for Father in 2016, 2017 and 2018, and we conclude that it was not error or an abuse of discussion for the Family Court to calculate Father's gross monthly income based on income reported for the 2017 tax year, as opposed to year-to-date income for 2018.

(3)  Mother argues that the Family Court erred in allocating the parties' home equity line of credit (**HELOC**) debt equally between the parties and that the Family Court should have instead charged Father with marital waste.  "Waste of marital assets is chargeable to a divorcing party when, during the time of the divorce, a party's action or inaction caused a reduction of the dollar value of the marital estate under such circumstances that he or she equitably should be charged with

having received the dollar value of the reduction." Chen v. Hoeflinger, 127 Hawaiʻi 346, 358, 279 P.3d 11, 23 (App. 2012) (citation and quotation marks omitted).

Mother first argues that "the totality of the trial evidence" established that Father used "many of the funds" from the HELOC to pay his personal expenses, for which Mother received no benefit, and that they were not used for the ordinary course of business or for living expenses. The Family Court received extensive, detailed testimony and other evidence from both parties on this issue and entered numerous FOFs based on its assessment of this evidence. Ultimately, the Family Court accorded more weight to Father's evidence detailing his HELOC expenditures, and the Family Court had discretion to do so. See In re Doe, 95 Hawaiʻi at 190, 20 P.3d at 623 (noting that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence, as such is the province of the trier of fact).

Mother submits that Father "repeatedly spent exorbitantly on personal expenses, trips, a silent auction, multiple meals out, a football pool, taking his girlfriend to a hotel." But the evidence Mother cited pertaining to Father's spending in 2017 (the year he took out the HELOC) concern: (1) three guitars (beginner, acoustic and electric) for NW; (2) a $407 Holiday Inn "staycation" with Children; (3) various meals out and recreation with Children; and (4) a $180 football pool.

Mother also cites two pages of Father's credit card statements; at trial, Mother's counsel questioned Father about those pages to establish that he spent a $331 Costco Rewards balance down to $52. It appears that the Family Court did not abuse its discretion by refusing to deem the foregoing as marital waste. Finally, Mother appears to contend that Father's HELOC expenditures for his own expenses constitute waste because they did not benefit her. But "a reduction in the marital estate does not, in and of itself, trigger the court's equitable power to charge the spending party." H.K. v. R.L., No. 29370, 2010 WL 894810, *3 (Haw. App. Mar. 11, 2010) (SDO) (holding that family court did not abuse its discretion in refusing to equitably charge husband for a $92,546 down payment on a new house, $4,627 monthly mortgage payments, $22,000 in new furnishings, $30,947 for a new truck, and a $30,000 company debt payment, where wife failed to demonstrate how such expenditures were fiscally irresponsible or occurred "under such circumstances" as to trigger the family court's equitable powers); see also Kakinami v. Kakinami, No. 29340, 2011 WL 1836718, *2-3 (Haw. App. May 11, 2011) (SDO) (holding that family court did not err in finding that wife spent certain funds for "ordinary and customary household and living expenses" — including attorneys' fees, expenses incident to purchasing and setting up a new home, and vacations—and noting that while husband submitted testimony and evidence "that could give rise to an inference of dissipation,"

the family court was entitled to weigh conflicting evidence and make credibility determinations).

Mother also contends that the Family Court erred (in, *inter alia*, FOFs 118-132) in finding that Father's business income was "not sufficient to cover the expenses for two separate households, that he was justified in using the HELOC to move his business [(his lease had expired)], and that he used the funds to pay only the family's personal expenses." Upon review, although there is conflicting evidence in the record, substantial evidence supports FOFs 118-132, and as noted above, it is within the Family Court's discretion to assess the weight of the evidence presented. See, e.g., In re Doe, 95 Hawaiʻi at 197, 20 P.3d at 630 ("it is not the province of the appellate court to reassess the credibility of the witnesses or the weight of the evidence, as determined by the family court").

For these reasons, we conclude that the Family Court did not err or abuse its discretion in allocating the HELOC debt equally between the parties.

Also in conjunction with her third point of error, JW contends that the Family Court erred in awarding LW Category 1 credit of $46,581 for pre-marriage monthly house payments for the Ewa house. LW correctly notes that JW did not challenge LW's pre-marital equity claims at trial. JW states that she preserved this error for review in her closing statement and in her proposed FOF/COL. However, JW's closing statement does not

discuss premarital claims.  Although Mother's May 29, 2019 proposed FOF/COL states that Father "did not prove that his monthly house payment statements on the [Ewa house] prior to marriage contributed to any increase in value," the proposed FOF/COL (submitted <u>after</u> the Family Court entered the March 7, 2019 Divorce Decree) does not "raise an argument at trial."  <u>See</u> <u>State v. Moses</u>, 102 Hawaiʻi 449, 456, 77 P.3d 940, 947 (2003) ("As a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal; this rule applies in both criminal and civil cases.").  Accordingly, this argument is waived.

For these reasons, the Family Court's March 7, 2019 Divorce Decree is affirmed in part and vacated in part.  The determinations of spousal support and child support, as set forth in the Divorce Decree, as well as the Family Court's November 29, 2018 Decision and Order and June 25, 2019 FOFs/COLs, are vacated in part to the extent that those determinations are based in part on imputation of income to JW in the amount of $1,751.  This case is remanded to the Family Court for further proceedings consistent with this Summary Disposition Order.

DATED: Honolulu, Hawaiʻi, October 28, 2021.

On the briefs:

Rebecca A. Copeland,
for Plaintiff-Appellant.

Peter Van Name Esser,
for Defendant-Appellee.

/s/ Lisa M. Ginoza
Chief Judge

/s/ Katherine G. Leonard
Associate Judge

/s/ Clyde J. Wadsworth
Associate Judge